IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 26, 2002 Session

## ERIN MONEYMAKER EARLEY v. ROBERT A. MONEYMAKER

**Appeal from the Chancery Court for Anderson County**
**No. 98CH6999      William E. Lantrip, Chancellor**

FILED JULY 18, 2002

**No. E-2001-02462-COA-R3-CV**

The parties to this action were divorced in 1999, and pursuant to the final decree, Erin Moneymaker Earley ("Mother") was awarded sole custody of the parties' young daughter, with Robert A. Moneymaker ("Father") having visitation. Over two years later, Father filed a petition requesting a change in custody. The Trial Court concluded Father failed to prove there had been a material change in circumstances justifying a change in custody and denied the petition. Father appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Jerrold L. Becker, Knoxville, Tennessee, for the Appellant Robert A. Moneymaker.

H. Gene Bell and Anthony M. Avery, Knoxville, Tennessee, for the Appellee Erin Moneymaker Earley.

# OPINION

## Background

Father and Mother were divorced on May 29, 1999. The Final Decree of Divorce incorporated the terms of a Marital Dissolution Agreement ("MDA") between the parties. The parties have one child, a daughter, who is currently four years old. The MDA provided Mother would be awarded "sole care, custody and control of the parties' child, subject to the rights of the [Father] as set out more fully herein." A thorough visitation schedule, other rights accorded to Father, and the amount of child support to be paid by Father were set forth in the MDA.

In March of 2001, Mother filed a petition for contempt, claiming numerous violations of the Final Decree and MDA by Father and his current wife. Mother sought, among other things, to have Father held in contempt and a restraining order prohibiting Father's current wife from interfering with Mother's ability to contact her daughter when Father exercises visitation. Father's response essentially denied the allegations contained in the petition. Father then filed a motion seeking to prohibit Mother from terminating the services of the current babysitter, Cindy Manning ("Manning"), and to restrain Mother from leaving the child with "any other babysitter without the express consent" of Father. Father also filed a counter-petition for contempt, and requested custody of the child be transferred to him.

A hearing was held on the various petitions for contempt and Father's request for a change in custody. The first witness was Pete Nance ("Nance"), a Sergeant with the Oak Ridge Police Department. Nance testified that one evening Father was returning the parties' daughter to Mother, and the exchange took place at the police station. Father believed Mother had been drinking and was concerned about the safety of their daughter. Nance administered a field sobriety test to Mother. Mother admitted having had a couple of drinks and Nance could smell alcohol on her breath. Mother, however, passed the field sobriety test and Nance described Mother as "very normal". Mother was allowed to leave with the child.

Father owns a plumbing mechanical company and has been married to his current wife, Judy Moneymaker, for two years. Although not contained in the record on appeal, Father filed a Petition for Order of Protection. The petition was filed because of events which occurred in February of 2001. According to Father, he was scheduled to return his daughter to Mother at 6:00 p.m. at the police station. He claimed Mother had been making threats, and he assumed she was in one of "her rages". Anticipating trouble, he notified the police. When he arrived at the police station and opened the car door, Mother brushed up against him, crawled in the back seat, and began to unbuckle the child's car seat. When Father's current wife asked Mother to get out of the car, Mother slapped her hand. Father also testified he had messages from Mother earlier that day wherein Mother used foul language and cursed at him. Father claimed Mother was unstable, had a drinking problem, was constantly yelling and screaming, and he did not want his daughter subjected to this type of behavior. Other than the event testified to by Nance, Father could recall no other occasion where he witnessed Mother drinking in recent months. Father testified he and Mother were unable

to get along, "period".  Father also was concerned about Mother's alleged use of drugs.  Prior to the trial, the parties had agreed to undergo drug testing, which Father complied with.  To his knowledge, Mother never submitted to this testing.

According to Father, Mother called numerous times a day to talk to their daughter and it caused problems when he was trying to engage in activities with the child.  Father claimed to have received as many as 27 to 30 messages in a six hour period.  Father also testified Mother will not refer to his current wife by her real name, but instead uses derogatory and profane terms.  Pursuant to the MDA, Mother was required to confer with Father regarding anything affecting the welfare of their daughter.  Notwithstanding this requirement, Father stated Mother changed the babysitter without conferring with him first.  The babysitter they had been using, Cindy Manning, had taken care of the child since she was nine months old.  Father claimed to have noticed a change in his daughter during the time the new babysitter was taking care of her.  Father has heard Mother curse at and in front of their daughter numerous times.

On cross-examination, Father was asked if he had beaten Mother during the period of 1994 through 1999, to which he responded: "Yes, sir, I have hit her."  Father asserted, however, that Mother always struck or spit at him first.  Father also acknowledged he shot and killed a man in 1988, then proceeded to live with the deceased's wife for 6 years.  Criminal charges were dismissed against Father because the deceased was breaking into Father's house at the time of the shooting.  Father admitted to drinking and driving with his daughter and step-son in the car.  Father claimed this happened years ago.  Other than Mother's abusive language, he could point to no other events which he considered child abuse.

Mother testified to her version of the incident which occurred while picking up her daughter in February of 2001.  Mother stated she got out of her car and when Father opened his car door, her daughter was very excited and was yelling for her.  Mother claims Father stepped away from the car, and she reached into the car and began to unbuckle her daughter's car seat.  When she reached in the car, Father's current wife smacked her on the hand and told Mother to get out of the car, which she did.  Mother testified that when she would call to talk with her daughter at the designated time and no one answered, she would continue to call.  Mother described numerous beatings she endured at the hands of Father over a four year period while they were married.  According to Mother, Father has a drinking problem and gets mean when he is drinking.  He also has beaten her son with a belt.  Mother admitted to having verbal altercations over the telephone with Father's current wife.  Mother testified she works for the U.S. Postal Service in Knoxville.  Mother has applied for a day shift position with the Postal Service in Oak Ridge.

Manning testified she started babysitting the parties' daughter when the child was nine months old.  She has continued to babysit the child, except for a brief period of time when she decided to quit.  One of the reasons she quit was because of the "foul" language Mother would use around the children.  Manning stated the foul language did not stop until Father filed the petition for a change in custody.  There were several times Manning either witnessed or heard Mother scream at her child.  Manning testified that on three occasions, Mother attempted to pick up her daughter

after Mother had been drinking. Manning refused to allow her to take the child and Mother returned the next day to retrieve her. On two other occasions, Manning drove the child home because Mother seemed impaired. In Manning's opinion, and based on her observations, Father has a wonderful relationship with his daughter.

Husband's current wife, Judy Moneymaker, also testified. Judy Moneymaker testified Father is very nurturing to his daughter. When Mother calls on the telephone, she uses foul language with whomever answers the phone. Judy Moneymaker testified she and Father would receive numerous calls from Mother throughout the course of the day whenever Father was exercising visitation. As to the events of February 2001, Judy Moneymaker testified Father opened the car door at which time she (Judy Moneymaker) began to unbuckle the car seat. Mother then pushed Father out of the way and slapped Judy Moneymaker on the hand as she was unbuckling the child from the car seat. Father and Judy Moneymaker then proceeded into the police station to file a police report, and Mother followed them inside. Judy Moneymaker admitted that Father drinks throughout the week, but he only drinks at home and does not get intoxicated around his daughter. Judy Moneymaker testified she witnessed Mother verbally and emotionally abuse her daughter, although she never witnessed any physical abuse.

Mother's fourteen year old son, Jeremy Hyatt ("Hyatt"), testified briefly to events which occurred while Father was his step-father and living in the same house. According to Hyatt, Father "whipped [me] with a belt and had welts on me." Hyatt stated Mother has raised her voice at him, but has not used foul language or been abusive. Hyatt never witnessed Mother yelling at his little sister.

As pertinent to this appeal, the Trial Court concluded Father failed to carry his burden of proving there had been a material change of circumstances. The Trial Court essentially concluded the evidence showed the arguing and violence between the parties existed both prior to and after the divorce. Father appeals this determination.

## Discussion

A review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Brooks v. Brooks,* 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo,* without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999). As recently noted by this Court:

> In applying this standard of review, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." Koch, 874 S.W.2d at 575. Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and

credibility during the divorce proceedings themselves," appellate courts "are reluctant to second-guess a trial court's decisions." Gaskill v. Gaskill, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The courts' paramount concern in a custody case is the welfare and best interest of the parties' minor children. Ruyle, 928 S.W.2d at 441; Koch, 874 S.W.2d at 575. This determination necessarily turns on the particular facts of each case. Koch, 874 S.W.2d at 575.

In child custody cases, the law is well established that when a decree awarding custody of children has been entered, that decree is res judicata and is conclusive in a subsequent application to change custody unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change of custody. Long v. Long, 488 S.W.2d 729 (Tenn. Ct. App.1972). In other words, once the trial court has made an initial determination with respect to custody, it cannot entertain a subsequent petition to modify custody absent a material change in circumstances. See Massengale v. Massengale, 915 S.W.2d 818, 819 (Tenn. Ct. App.1995). The material change of circumstances must be "compelling enough to warrant the dramatic remedy of changed custody" and must "directly affect the welfare of the minor." Musselman v. Acuff, 826 S.W.2d 920, 922 (Tenn. App. 1991); McReynolds v. McReynolds, No. 01A01-9702-CH-00064, 1997 Tenn. App. LEXIS 678 at *11 (Tenn. Ct. App. Oct. 3, 1997) (quoting Dailey v. Dailey, 635 S.W.2d 391, 393 (Tenn. Ct. App. 1981)). A material change in circumstances justifying modification of a child custody order may include factors arising after the initial determination or changed conditions that could not be anticipated at the time of the original order. Blair v. Badenhope, 940 S.W.2d 575, 576 (Tenn. Ct. App.1996) (citing Dalton v. Dalton, 858 S.W.2d 324, 326 (Tenn. Ct. App.1993)).

*Mims v. Mims*, No. W2001-01688-COA-R3-CV, 2002 Tenn. App. LEXIS 321 at *5 - *7 (Tenn. Ct. App. May 3, 2002)(No Rule 11 app. for perm. to appeal filed). Only after a trial court has found the existence of a material change in circumstances does it consider what custody arrangement is in the best interest of the child. *See Mims*, 2002 Tenn. App. LEXIS 321 at * 7, *8 ("If the trial court finds that there has been a material change in circumstances, it will then consider the petition to modify custody using a best interests standard.").

On appeal, Father argues there has been a material change in circumstances resulting from Mother's use of foul language and violent temper. Another reason Father claims a material change in circumstances is because the child is spending a lot of time with third parties because Mother works second shift.

The record in this case shows Mother and Father accuse each other of creating problems and interfering with the other's relationship with their daughter. Both parties essentially deny doing anything wrong or claim they were provoked if they did engage in any inappropriate behavior. What is clear, however, is Mother and Father have an extremely contemptuous relationship which has existed for many years. As is often the case, the child gets caught in the middle.

Most, if not all, of the factors which Father claims qualify as a material change in circumstances are more relevant to a comparative fitness analysis. For example, Father claims Mother's yelling and use of foul language make his home a better choice for their daughter. As noted above, however, a comparative fitness analysis is not undertaken until after a material change in circumstances has been shown. The determination as to whether there has been a material change in circumstances is a factual issue. In light of the record before us, we cannot conclude the evidence preponderates against the Trial Court's conclusion that Father failed to prove there was a material change in circumstances. Much of the complained of conduct occurred both prior to and after the initial custody award to Mother, and, therefore, did not "arise after the initial determination". *Mims*, 2002 Tenn. App. LEXIS 321 at *7. The same holds true for the fact that Mother is working second shift which necessitates use of a babysitter and lessens Mother's time with her daughter. The Trial Court had the opportunity to observe the demeanor and credibility of the witnesses. After hearing the testimony of the parties and witnesses, the Trial Court concluded that the complained of conduct which Father claims qualifies as a material change in circumstances existed prior to the initial custody determination and, therefore, was no "change" at all. We affirm this determination and the resulting denial of Father's Petition to Modify Custody.

Mother has requested her attorney's fees incurred on this appeal. Exercising our discretion, we decline to award Mother the requested attorney's fees. From the record before this Court, it appears both parties love their daughter. This being so, perhaps both parties will find, for their daughter's sake, some source of entertainment other than continuing their battles with each other.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant Robert A. Moneymaker and his surety.

_____
D. MICHAEL SWINEY, JUDGE